# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-60521

AUSTIN INDUSTRIAL SPECIALTY SERVICES, L.P.,

    Petitioner,

v.

OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION;
THOMAS E. PEREZ, Secretary, Department of Labor,

    Respondents.

United States Court of Appeals
Fifth Circuit
**FILED**
August 25, 2014
Lyle W. Cayce
Clerk

Petition for Review of an Order of the
Occupational Safety and Health Review Commission

Before STEWART, Chief Judge, and HIGGINBOTHAM and ELROD, Circuit Judges.

PER CURIAM:

    The Occupational Safety and Health Administration ("OSHA") issued Austin Industrial Specialty Services, L.P. ("Austin") a citation for violations of hazardous-chemical regulations promulgated under the Occupational Safety and Health Act ("Act"). After a hearing, the administrative law judge affirmed two items in the citation—(1) failure to identify and evaluate respiratory hazards in the workplace and (2) failure to provide employee training regarding certain hazardous chemicals—and vacated the other three items. The Occupational Safety and Health Review Commission ("Commission") denied discretionary review, and Austin filed a petition in this court, seeking

to overturn the administrative law judge's decision on several grounds. We deny Austin's petition.

I.

As the administrative law judge explained in his decision, at all times relevant for purposes of this lawsuit, Austin operated under a subcontract at a chemical plant in Deer Park, Texas, owned by Lubrizol, a chemical manufacturer. The plant, covering nearly 200 acres, is one of the largest producers of lubricant additives in the world and includes multiple processing units, rail car unloading and loading facilities, pipelines, and maintenance and administrative buildings. Austin had approximately 166 employees at the site. Austin employees performed a variety of services, including maintenance, capital work, warehouse work, and rail car cleaning. At issue here is Austin's rail car cleaning process.

A team of five Austin employees was assigned to clean the rail cars that carried chemical products into and out of the plant. The rail car cleaning process always began with opening the "manway," a bolted hatch on the top of each rail car. Typically, a Lubrizol employee opened the manway in preparation for the cleaning, but approximately 5% of the time an Austin employee performed the task. Austin's health and safety director, Michael Morris, testified that he did not know if Lubrizol was testing the "environment" when the rail cars were opened. Morris also responded in the negative when asked if Austin performed any "air testing" or made "any sort of evaluation of any reasonable estimate of employee exposure to respiratory hazards while [its employees were] in the process of opening these manways on these railcars." Morris explained the lack of testing: "Well, our . . . employees are going to be wearing the [hydrogen sulfide] monitors that are going to be alarming before there's any significant exposure to the employees if it went off, and then they were trained to evacuate and leave the area if they do alarm."

Upon the opening of a manway, an Austin employee would perform a "spit test" to determine how much steam needed to be pumped into the rail car in order to properly clean it: "We would spit on it. If it move, that mean it's like water. It doesn't need a lot of steam. But if it doesn't move, it means it's real thick, to put a lot of steam on it." In accordance with the results of the spit test, Austin employees then would wash the rail car, which involved pumping steam into the rail car and draining the resulting liquid from the bottom. After the employees had completed their cleaning tasks, a Lubrizol employee would "sniff" the rail car and, if there was no chemical exposure, would issue a "confined space permit," allowing the employees to enter the rail car and complete the drying process.

Prior to each rail car cleaning shift, Austin employees convened for a "toolbox meeting." At the meeting, the employees reviewed a job safety checklist ("JSC") and a tank car wash record. The JSC contained prompts such as: "Has operations notified you of which railcars to be entered and cleaned?"; "Have all tripping hazards been removed?"; "Is [hydrogen sulfide] present in the rail car tank?"; "For confined space is breathing air required?" The tank car wash record was prepared by Lubrizol and contained a list of the rail cars to be washed each day. The tank car wash record also identified—by code number not name—the chemicals that had been transported in the cars. To decipher a given code number, Austin employees needed to obtain from Lubrizol a Material Safety Data Sheet ("MSDS"), which matched the codes with explanations of the chemicals. The employees did not have MSDSs at the toolbox meetings. Austin supervisors told the employees that they could obtain MSDSs from Lubrizol to learn about the chemicals in the rail cars. The employees were never provided any training regarding specific chemicals with which they might come into contact. On one particular day, as evidenced in

the record in this case, the tank car wash record reflected the codes for at least eleven different chemicals contained in the rail cars to be washed.

Austin also produced a job safety analysis ("JSA"), which was not reviewed at the daily toolbox meeting but was available at the cleaning site. The JSA provided a step-by-step set of instructions for, and list of potential hazards associated with, cleaning the rail cars. The hazards included: "Back strain"; "Falling from top of railcar"; and "Overcome by fumes of smell inside tank car." The JSA stated that the information contained therein did not cover "all potential hazards."

Over a period of several months, approximately 200 different chemicals moved through the facility in the rail cars. Austin employees did not wear respiratory protection during the cleaning process. The employees were required to wear hydrogen sulfide monitors, however. These monitors were designed to alert them of dangerous levels of exposure to that compound. Hydrogen sulfide can be fatal.

The investigation that resulted in the citation here was prompted by the death of an Austin employee, Jaime Godines, who was a member of the rail car cleaning team. On February 23, 2011, Godines died from asphyxiation when he lowered himself, without a confined space permit, into a rail car, identified as GATX 19654, that had not yet been cleaned. The rail car contained dangerous levels of hydrogen sulfide. Godines's death and the circumstances surrounding it are not at issue on appeal. We note the fact of the accident because it catalyzed OSHA's investigation into Austin's rail car cleaning process.

Following the investigation, OSHA issued a citation against Austin, asserting five items for "serious" violations related to the rail car cleaning process:

No. 13-60521

*Item 1*: Failure to identify and evaluate respiratory hazards in the workplace, including a failure to provide reasonable estimates of employee exposure to respiratory hazards and identifications of contaminants' chemical states and physical forms, in violation of 29 C.F.R. § 1910.134(d)(1)(iii).

*Item 2a*: Failure to ensure that employee exposure to hydrogen sulfide did not exceed the permissible exposure limit of 20 parts per million, in violation of 29 C.F.R. § 1910.1000(b)(2).

*Item 2b*: Failure to determine and implement administrative and engineering controls or personal protective equipment to limit employee exposure to hydrogen sulfide, in violation of 29 C.F.R. § 1910.1000(e).

*Item 3a*: Failure to maintain workplace copies of safety data sheets for each hazardous chemical and have those sheets readily accessible to employees, in violation of 29 C.F.R. § 1910.1200(g)(8).

*Item 3b*: Failure to provide employee training regarding hydrogen sulfide and the other chemicals to which Austin employees were exposed, in violation of 29 C.F.R. § 1910.1200(h)(3).

After a hearing, the administrative law judge affirmed Item 1 and Item 3b, assessing a total penalty of $10,800. Although OSHA had proposed a penalty of $7,000 for Item 1, the administrative law judge concluded that a 10% credit for Austin's "commitment to safety" and good faith was warranted and therefore imposed a penalty of $6,300. As for Item 3b, although OSHA had proposed a penalty of $7,000 for Item 3a and Item 3b combined, the administrative law judge concluded that a $5,000 penalty was appropriate for Item 3b standing alone and then granted a 10% credit for good faith, resulting in a $4,500 penalty for that item. The administrative law judge vacated the remaining items.

The Commission denied discretionary review, rendering the administrative law judge's decision a final order of the Commission. Austin timely filed this petition for review. Thus, only Item 1 and Item 3b are at issue here.

## II.

Because the administrative law judge's decision became a final order of the Commission, we review that decision on appeal. We are bound by the administrative law judge's findings of fact if those findings are supported by "substantial evidence." 29 U.S.C. § 660(a). The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619–20 (1966) (internal quotation marks omitted); *see also Trinity Marine Nashville, Inc. v. Occupational Safety & Health Review Comm'n*, 275 F.3d 423, 426–27 (5th Cir. 2001) (stating that we are bound by findings of fact supported by substantial evidence even if we "could justifiably reach a different result *de novo*."). We review the administrative law judge's legal conclusions for whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id.* at 427.

## III.

Austin brings four main challenges to the administrative law judge's decision to affirm Item 1 and Item 3b. First, Austin argues that, as a matter of law, OSHA is preempted from exercising jurisdiction in this instance. Second, Austin argues that it was deprived of "fair notice" that aspects of its rail car cleaning process were in violation of OSHA regulations. Third, Austin argues that items in the citation are barred by the applicable statute of limitations. Finally, Austin argues that the evidence presented at the hearing before the administrative law judge was insufficient to support the affirmances of Item 1 and Item 3b.

### A.

#### 1.

To show that OSHA is preempted from regulating Austin's operations, Austin points to the Act itself: "Nothing in this chapter shall apply to working

conditions of employees with respect to which other Federal agencies . . . exercise statutory authority to prescribe or enforce standards or regulations affecting occupational safety or health." 29 U.S.C. § 653(b)(1). The Supreme Court has interpreted this provision to require a federal agency to "affirmatively regulate[] the working conditions at issue" in order to "exercise" its preemptive authority. *Chao v. Mallard Bay Drilling, Inc.*, 534 U.S. 235, 244–45 (2002). Austin contends that three sources of federal law preempt OSHA: the Locomotive Inspection Act ("LIA"), a policy statement from the Federal Railway Administration ("FRA"), and the Federal Railroad Safety Act ("FRSA").

In support of its argument that the LIA preempts the Act, Austin relies on *Kurns v. Railroad Friction Products Corp.*, 132 S. Ct. 1261 (2012), and *Napier v. Atlantic Coastline Railroad Co.*, 272 U.S. 605 (1926). These cases, however, involved the preemptive effect of the LIA vis-à-vis state laws—tort law in *Kurns* and state locomotive equipment requirements in *Napier*. These cases have nothing to do with whether a federal agency has "exercised" authority over the working conditions at issue in the citation.

Next, Austin contends that a policy statement from the FRA has preemptive effect. Austin relies on *Velasquez v. Southern Pacific Transportation Co.*, 734 F.2d 216 (5th Cir. 1984). In *Velasquez*, we held that, because the FRA policy statement provided that "OSHA regulations *would not apply to* . . . walkways beside the [railroad] tracks," "such areas [we]re not subject to OSHA regulations." 734 F.2d at 218 (emphasis added). Austin points to nothing in the FRA policy statement providing the same with respect to employee exposure to respiratory hazards.[1] Austin also refers to an FRA

---

[1] In fact, as OSHA observes in its brief, the FRA policy statement specifically explains that the regulations at issue here would apply according to their terms, subject to exceptions

citation issued against Lubrizol, contending that the citation establishes the FRA's "exercise" of authority. The citation, however, was not directed at occupational safety but rather at transportation regulations—there was a leak from the bottom outlet of one of Lubrizol's rail cars containing a "load of environmentally hazardous substances." Neither the citation nor the regulation on which the citation is based, 49 C.F.R. § 173.31, refers to employee safety. Austin is unable to show that the FRA has exercised authority over the working conditions associated with cleaning rail cars containing hazardous substances.

Finally, Austin relies on the FRSA. Citing a law that was repealed in 1994, *see* 45 U.S.C. § 434, *repealed by* Pub. L. 103-272, § 7(b), 108 Stat. 1379, Austin broadly asserts that "Congress has expressly preempted regulations affecting railroad safety." Austin cites a multitude of cases dealing with federal preemption of state laws, none of which explain how § 653(b)(1) would operate to allow FRSA to preempt the regulations at issue here. Accordingly, because nothing in the LIA, the FRA, or the FRSA amounts to an exercise of authority sufficient under § 653(b)(1) to preempt OSHA here, the administrative law judge did not err on this matter. *See Trinity Marine*, 275 F.3d at 427.

2.

Austin argues that it is entitled to a "fair notice" defense by virtue of its participation in OSHA's Voluntary Protection Program ("VPP").[2] This is an

---

not relevant here. *See* FRA Policy Statement, 43 Fed. Reg. 10,583, 10,588, 10,589 (Mar. 14, 1978).

[2] Austin also nominally asserts the defenses of waiver and estoppel in its brief. We reject these defenses because, in its opening brief, Austin has not even attempted to show that OSHA "waived" any enforcement action or that OSHA engaged in affirmative misconduct, which is required to establish estoppel against a federal agency. *See Linkous v. United States*, 142 F.3d 271, 277 (5th Cir. 1998).

issue of fact. *See Fluor Daniel v. Occupation Safety & Health Review Comm'n*, 295 F.3d 1232, 1237 (11th Cir. 2002) ("Fluor Daniel can prevail only if it succeeds on the claim that the past inspections somehow led the company to believe that it could not be found in violation of the respiratory protection regulation. This argument fails, however, because we cannot disturb the [Commission's] findings of fact unless they are unsupported by substantial evidence."); *see also Trinity Marine*, 275 F.3d at 431.

Established by OSHA, the VPP "is a cooperative program that allows qualified companies with rigorous safety practices and strong safety records to avoid regularly programmed . . . inspections." *Fluor Daniel*, 295 F.3d at 1237 n.3. OSHA "continues to monitor [the] safety and health practices" of VPP participants, however, and also "enforce[s] federal standards" when necessary. *Id.* The VPP manual, which is contained in the record in this case, states that OSHA "continues to investigate valid employee safety and health complaints, fatalities, catastrophes, and other significant events at VPP participant sites." Austin's VPP approval in 2007 was based on the "site's VPP Application, documentation review onsite, interviews with employees, annual evaluations, and site walk-throughs of the facility."

To establish a lack of fair notice, Austin must show that, through the VPP, it had a fair expectation that OSHA had found its procedures satisfactory. *See Trinity Marine*, 275 F.3d at 430. Our decision in *Trinity Marine* is instructive. There, OSHA had issued a citation against a company for employing non-conforming electrical boxes in a shipyard. *Id.* OSHA then withdrew the citation and several years later issued another citation for the same problem. *Id.* We held that "[w]here a company has been informed by an [Administration] inspector that its procedures or processes are safe and satisfactory, the company has a valid fair notice complaint if cited for the same procedures in a later inspection." *Id.* We then explained that the

circumstances surrounding the issuance and withdrawal of the citation were sufficient to show that the company had a "fair expectation" that OSHA had found the electrical boxes to be satisfactory. *Id.*; *see also Fluor Daniel*, 295 F.3d at 1238 ("[E]ven if Fluor Daniel could show that [OSHA] inspectors considered and failed to issue a citation for the lack of respirators during the . . . VPP visits, the company would still not be able to prevail in the absence of any *affirmative* approval of the lack of respirators. Fluor Daniel makes no claim that any [Administration] officials expressly said that respirators were unnecessary, and mere silence by [Administration] inspectors is not enough to support a company's claim that it was lulled into violating a regulation.").

In support of its argument that it lacked fair notice, Austin points to explicit "findings" in OSHA's 2007 VPP report on Austin. Not one of those findings, however, addresses the specific failures identified in Item 1 and Item 3b. Not one of those findings refers to the rail car cleaning area. Although Austin asserts in its brief that there is "unrequited evidence that the exact area at issue was observed, evaluated and viewed" during the VPP approval process, the record does not so reflect. In fact, no witness at the hearing could testify to the fact that members of OSHA's VPP review team inspected the rail car cleaning area in particular in preparation for the 2007 VPP report.[3] Furthermore, we are not persuaded by the fact that an OSHA inspector viewed the rail car cleaning area during a 2011 VPP re-certification inspection. The 2011 VPP report was never finalized, and, as explained above, all of the "findings" to which Austin refers are from the 2007 VPP report.

---

[3] Austin argues that the administrative law judge erred by holding one of these witnesses, Morris, the safety director, to a "personal knowledge" standard. We disagree. The administrative law judge simply noted in his decision that Morris stated that he did not know a fact about the 2007 VPP review.

As the administrative law judge found, there was "no evidence that, rather than constituting a representative evaluation, the VPP evaluation included a review of every individual workstation or procedure." Thus, we agree with the administrative law judge that nothing in the VPP report informed Austin that its rail car cleaning procedures specifically were safe and satisfactory. Nothing in the VPP protected Austin from being subject to violations of the regulations at issue here. Accordingly, bound to the administrative law judge's findings of fact, we conclude that Austin cannot establish that it had a "fair expectation" that its rail car cleaning process satisfied the relevant regulations. The administrative law judge therefore did not err in rejecting the defense of fair notice.[4]

3.

Austin argues that the statute of limitations bars this citation. Under the Act, "[n]o citation may be issued . . . after the expiration of six months following the occurrence of any violation." 29 U.S.C. § 658(c). Pointing to the allegations underlying Item 1, Austin observes that OSHA did not prove that an Austin employee physically opened a manway opening within six months of

---

[4] Austin also argues that the administrative law judge erred in denying Austin's motion to compel the depositions of Administration officials who conducted the 2007 VPP review and denying Austin discovery regarding the VPP re-certification process in 2011 (the 2011 VPP report was in draft, not final, form at the time of the accident). Discovery rulings are reviewed for abuse of discretion. *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994). We decline to disturb the administrative law judge's ruling on the motion to compel because, beyond asserting that "[a]ll of the speculation and incorrect findings made by the [administrative law judge] would have been controverted by information obtained in discovery," Austin does not explain how those depositions would have revealed that OSHA granted "affirmative" approval to the rail car cleaning process, as would be required to establish a lack of fair notice. As to the discovery regarding the VPP re-certification process, Austin does not cite to any portion of the record to establish what the 2011 VPP report contained. Discovery regarding the process of the 2011 review is therefore irrelevant to whether the 2007 VPP approval established fair notice. Accordingly, we cannot say that the district court abused its discretion on either matter. Austin's related challenge to OSHA's assertion of the "deliberative process privilege" regarding the 2011 VPP report is moot.

the citation. Austin therefore contends that there was no proof of an "occurrence" within the meaning of the Act because there was no proof of actual exposure to hazardous chemicals.

As the administrative law judge explained, OSHA may cite a party for an uncorrected violation of applicable regulations within six months from the time that OSHA discovers, or should have discovered, the facts establishing the violation. The investigation precipitating the citation in this case commenced after February 23, 2011, the date of Godines's death, and the citation was issued on August 16, 2011—a span of less than six months. We note again that Godines's death is not the relevant "occurrence" for purposes of the statute of limitations—neither the death nor the cause of death is the foundation for the citation.[5] The date is a guidepost, however, for the timeline of the investigation, given that the investigation commenced because of the accident. These facts thus reflect that OSHA discovered the violation well within six months of issuing the citation. In other words, we agree with the administrative law judge that § 658(c) does not bar a citation "where the employee access to the condition providing the basis for the citation occurred within six months of the citation's issuance." We further agree with the administrative law judge that "Austin was under a continuing obligation to have processes and procedures in place to evaluate the respiratory hazards to which employees would be exposed." As a result, we conclude that the violations of the regulations regarding Austin's obligation to have adequate

---

[5] Indeed, in vacating one of the other items not at issue on appeal, the administrative law judge explained that Godines's "entry into the tank [wa]s not properly before" the court. Moreover, the administrative law judge concluded that, "[a]side from the entry of Mr. Godines into the railcar, there is no evidence that Austin employees were exposed to impermissible levels of [hydrogen sulfide] while engaged in the tasks associated with cleaning the railcars." OSHA does not challenge any of these findings on appeal.

evaluation (Item 1) and training (Item 3b) measures in place *occurred* when OSHA discovered those violations in the course of its investigation.

Although Austin argues at length in its briefs that OSHA was required to prove that an Austin employee opened a manway on a particular date, that is not the issue. The issue is whether Austin failed to comply with the regulations requiring evaluation and training measures, and OSHA cited Austin accordingly. *See* § 658(a) ("If, upon inspection or investigation, the Secretary . . . believes that an employer has violated a requirement of . . . any regulations prescribed pursuant to this chapter, he shall with reasonable promptness issue a citation to the employer."). As the administrative law judge found that, "as part of their regular and continuing duties, Austin employees were required to work by recently opened manways and that 5% of the time those manways were opened by Austin personnel." We therefore reject Austin's argument that the citation is time-barred.[6]

## B.

### 1.

We now shift to the sufficiency of the evidence in support of these two items, beginning with Item 1. In that item, OSHA charged Austin with a violation of § 1910.134(d)(1)(iii) for failing to identify and evaluate respiratory hazards.[7] As summarized by the administrative law judge, OSHA alleged that "Austin failed to identify and evaluate the workplace to obtain a reasonable

---

[6] In its brief, Austin discusses the discovery rule and why OSHA should not be permitted to extend the limitations period. The limitations period was not "extended." We therefore do not address the discovery rule here.

[7] Section 1910.134(d)(1)(iii) provides: "The employer shall identify and evaluate the respiratory hazard(s) in the workplace; this evaluation shall include a reasonable estimate of employee exposures to respiratory hazard(s) and an identification of the contaminant's chemical state and physical form."

estimate of employee exposures to respiratory hazards while employees performed tasks while working on the Lubrizol railcars."[8]  Austin contends that the decision to affirm Item 1 is not supported by substantial evidence.[9]

We conclude that the evidence amply supports the administrative law judge's decision. *See Trinity Marine*, 275 F.3d at 426–27.  It is undisputed that Austin employees cleaned rail cars that had hauled hazardous chemicals and that the rail cars, which were empty, contained residue of those hazardous chemicals.  Moreover, as the administrative law judge found, the rail cars emitted fumes and that Austin employees performed spit tests (requiring them to lean over the open manway) before cleaning the rail cars.  Morris, Austin's safety director, acknowledged that Austin did not perform an evaluation of respiratory hazards during the opening of the manways, and, at least at times, Lubrizol employees did not perform the sniff test until after Austin employees had completed the cleaning process.  At the toolbox meetings, Austin employees were not provided the names of the chemicals that had been transported in the rail cars to be cleaned.  The MSDSs, the source from which Austin employees could discover which chemicals had been in the rail cars, were not provided at the toolbox meetings.  These facts are "adequate to support a conclusion" that Austin failed to evaluate the respiratory hazards to which Austin employees were exposed when they cleaned rail cars, as required by § 1910.134(d)(1)(iii).  *See Consolo*, 383 U.S. at 620.

---

[8] We reject Austin's argument that the administrative law judge "amended the pleadings" by reading out of Item 1 the allegations regarding Austin employees opening manways.  The administrative law judge did not amend anything.  The issue here is straightforward—i.e., whether there is substantial evidence to support the affirmance of Item 1, which charged Austin with a violation of § 1910.134(d)(1)(iii).

[9] Austin does not challenge the administrative law judge's interpretation of the regulation as a matter of law.

Important to our conclusion, none of the practices to which Austin points—requiring employees to wear hydrogen sulfide monitors, the production of JSCs, and the production of JSAs—constitutes a "reasonable estimate of employee exposures to respiratory hazard(s)." *See* § 1910.134(d)(1)(iii). Specifically, Austin asserts that an OSHA official "testified that the [hydrogen sulfide] monitor and administrative controls regarding permitted confined space entry equates to an evaluation of the potential hazards. This fact is dispositive of this issue and disproves the ALJ's finding." The record does not support that assertion. The cited transcript pages do not reflect official's testimony that monitors and confined space entry permits "equate" to an evaluation of potential hazards as required by the regulation. Instead, the official merely affirmed the fact that Austin does provide monitors and does require confined space entry permits. Therefore, nothing in that official's testimony is "dispositive of this issue." Based on our review of the record, the administrative law judge's conclusion is supported by substantial evidence.[10]

2.

Austin also contends that the evidence in support of the decision to affirm Item 3b, which charged Austin with a violation of § 1910.1200(h)(3),[11]

---

[10] Austin also argues that the administrative law judge erred by not allowing Austin to present evidence of a settlement agreement between OSHA and Lubrizol. The administrative law judge concluded that "litigating" the differences between the Lubrizol citation and the Austin citation would create confusion of the cases and would be a waste of time. Because Austin fails to explain adequately how the Lubrizol citation is relevant to Item 1, we conclude that the administrative law judge did not abuse its discretion in making this evidentiary ruling. *See King*, 31 F.3d at 346.

[11] The regulation provides that employee training must include at least:

(i)    Methods and observations that may be used to detect the presence or release of a hazardous chemical in the work area (such as monitoring conducted by the employer, continuous monitoring devices, visual appearance or odor of hazardous chemicals when being released, etc.);

is not substantial. We conclude that the evidence was sufficient here as well. At the hearing before the administrative law judge, the evidence established that the supervisors did not train the crew members regarding the chemicals that were in the rail cars. Two employees on the rail car cleaning team testified that their supervisors told them that they could obtain MSDSs from Lubrizol to learn the chemicals. As pointed out by the administrative law judge, Austin cites to no evidence showing that Austin employees were trained to use the MSDSs in a way that would satisfy the requirements of § 1910.1200(h)(3)(i)–(iv). Austin seizes, however, on a piece of testimony from one of the crew members: "Almost always I would ask [Lubrizol employees] about the material in the car we're washing." The fact that a crew member asked about the chemicals, however, does not equate to training under § 1910.1200(h)(3)(i)–(iv).

Austin focuses heavily on the hydrogen sulfide monitors. Austin points to evidence that "[a]ll employees knew and were trained that if the [hydrogen sulfide] monitor alarmed they were to immediately evacuate the area." Austin also asserts that "[a]ll record evidence and testimony support Austin's employee's [sic] training on and knowledge" of the hazards of hydrogen sulfide. Austin fails, however, to cite to a portion of the record supporting that

---

(ii)   The physical, health, simple asphyxiation, combustible dust, and pyrophoric gas hazards, as well as hazards not otherwise classified, of the chemicals in the work area;

(iii)  The measures employees can take to protect themselves from these hazards, including specific procedures the employer has implemented to protect employees from exposure to hazardous chemicals, such as appropriate work practices, emergency procedures, and personal protective equipment to be used; *and,*

(iv)  The details of the hazard communication program developed by the employer, including an explanation of the labels received on shipped containers and the workplace labeling system used by their employer; the safety data sheet, including the order of information and how employees can obtain and use the appropriate hazard information.

§ 1910.1200(h)(3)(i)–(iv) (emphasis added).

assertion. Moreover, Austin does not cite any authority to establish that a monitor *per se* satisfies the regulation. Austin does not explain how a monitor, for example, amounts to *training* regarding the hazards of hydrogen sulfide. *See* § 1910.1200(h)(3)(ii). Similarly, Austin does not explain how requiring a confined space permit constitutes training of any sort.

Continuing with its focus on hydrogen sulfide, Austin contends that it was the only chemical that could have been the subject of required training pursuant to § 1910.1200(h)(3). Austin asserts that the administrative law judge erred in finding that Austin employees were exposed to over 200 chemicals and that Austin failed to train its employees on the hazards associated with those chemicals. Austin argues that there is no evidence of those findings in the record. On the contrary, the administrative law judge's findings are in fact supported by the record: An OSHA official testified that his investigation revealed approximately 200 chemicals to which Austin employees had been exposed in the three months prior to the incident. Moreover, the tank car wash record, part of the record in this case, reflected that eleven cars were to be washed in the period of one day, and each contained a different chemical. Thus, even if the rail car cleaning team members were not exposed to all 200 chemicals, they were at least exposed to more than hydrogen sulfide. Austin points to no training provided to its employees regarding chemicals other than hydrogen sulfide. We therefore conclude that the decision to affirm Item 3b is supported by substantial evidence.

Austin's petition is DENIED.